# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TEXAS

### TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | No. 5:18-CR-6-RWS-CMC |
| | § | |
| ARMANDO MOYA | § | |

---

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

---

The above-entitled and numbered cause of action was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. The following pending motion is before the Court:

**Defendant's Motion to Suppress Statement (Docket Entry # 49)**.

The Court, having reviewed the relevant briefing and hearing arguments of counsel March 12, 2019, recommends the motion be **DENIED**.

## I. DEFENDANT'S MOTION TO SUPPRESS

Armondo Moya ("Defendant") has been charged in a two-count indictment, alleging that he conspired to traffic drugs and that his offense involved a firearm, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 924(c)(1)(A). Docket Entry # 53 at 1–2. On February 20, 2019, Defendant filed his current motion to suppress. According to Defendant, on June 7, 2018, Defendant was interrogated by agents of the Drug Enforcement Agency ("DEA"), the Texas Department of Public Safety ("DPS") and other federal and state law enforcement officers in violation of his constitutional rights. Docket Entry # 49 at 1.  Defendant argues he did not knowingly, intelligently, or voluntarily waive

his Fifth Amendment right to remain silent, nor was he properly or sufficiently advised of his rights. *Id.* According to Defendant, any statement taken during the interrogation was the result of coercion, physical intimidation, and/or unauthorized promises of leniency by members of law enforcement and are, therefore, involuntary and inadmissible for any purpose. *Id*. at 2.

## II. THE GOVERNMENT'S RESPONSE

In its response, the Government asserts the following background facts. On June 6, 2018, law enforcement near Corpus Christi, Texas, stopped a vehicle containing nine bundles of drugs headed for New Boston, Texas. Docket Entry # 64, Exhibit 1(Criminal Complaint and Affidavit of Maximo Mella in Support of Application for Arrest Warrant ("Mella Aff.")) at 4, ¶¶ 9-11. The three individuals transporting the drugs (one of whom was Jose Moya) said they were taking the drugs to 503 North Bowie Street in New Boston, Texas in exchange for United States currency. *Id.*, ¶ 10.

Jose Moya further told agents the nine bundles of suspected heroin were going to be delivered to his brother, Defendant Armando Moya, at Defendant's residence at 503 North Bowie Street in New Boston, Texas. *Id*. at 5, ¶ 12. Jose Moya then described how he had delivered drugs to Defendant on prior occasions and picked up bulk United States currency from Defendant, which ultimately was transported to Mexico. *Id.*

On June 7, 2018, at approximately 12:30 a.m., DEA Tyler Resident Office ("TRO") agents obtained a search warrant for 503 North Bowie Street, New Boston, Texas. *Id*., ¶ 13. Texas DPS agents and DEA TRO agents executed the search warrant at Defendant's home at approximately 1:00 a.m. on June 7, 2018. *Id*., ¶ 14. Defendant and his family were home at that time. *Id.*, ¶ 15. At approximately 1:11 a.m., DEA Special Agent Maximo Mella ("Agent Mella") read Defendant his *Miranda* rights. *Id*., ¶ 16; *see also* Docket Entry # 64, Exhibit 2 ("Report of Investigation") at 1. At

that time, Defendant confirmed he understood his rights and agreed to speak with investigators. *Id.* DEA Special Agent Darby Hodges and DEA Task Force Officer Greggory McCasland observed Defendant receive, acknowledge, and waive his *Miranda* rights. *Id.*

During the conversation with law enforcement, Defendant described in detail the drug trafficking activity in which he had been engaged. Mella Aff.*,* ¶¶ 17-18; Report of Investigation at 1-5. Specifically, Defendant described how his brother, Jose Moya, had invited him to begin working as a drug and bulk cash courier for a drug trafficking organization in Mexico that was led by a man named "Don Roberto." Report of Investigation at 2. Defendant said he accepted the offer because he wanted to make some money. *Id.* He said he had received seventy bundles from Jose Moya over the course of seven separate trips. *Id.* He said he "knew . . . something bad" was in the bundles he was transporting. *Id.*

Prior to each delivery, Defendant explained, he would communicate with Don Roberto via WhatsApp about when to expect drug shipments and where to deliver them. *Id.* Defendant admitted he was paid $700.00 to $1,000.00 per bundle for delivering them to Tennessee, Ohio, or New York. *Id.* Don Robert also provided Defendant with $2,000.00 for each trip to cover his travel expenses (fuel, rental vehicle, and other expenses). *Id.* After Defendant arrived at the delivery city, Don Roberto would communicate further with him via WhatsApp about a specific meet location to deliver the drugs. *Id.*

Defendant described how Don Roberto used coded communication to direct him, explaining the code name for New York was "torres" or *towers*; the code name for Columbus, Ohio, was "colon;" the bundles of drugs were called "comida" or *food*; and the phrase "barrer la basura" or *sweep the trash* meant Defendant was supposed to pick up bulk currency. *Id.* at 4. Defendant

described some of his trips in detail. For example, he revealed he had traveled to Nashville, Tennessee, where he exchanged the drugs for bulk currency and received $9,000.00 from the person to whom he delivered the drugs. *Id.* at 2–3. He also described in detail a trip to Columbus, Ohio in April 2018, where he met another person to exchange drugs for bulk cash. *Id.* at 3. Defendant also described meeting a man known as "El Chino" in New York. *Id.* He described El Chino's physical characteristics to the agents, including that he was clean shaven, bald, had a dark skin complexion, was between approximately five feet nine inches and five feet eleven inches tall, and had a heavy built body type. *Id.* at 4. He also described El Chino's vehicle as a newer model, small silver Toyota SUV. *Id.*

During this conversation, Defendant provided law enforcement with written consent on a DEA form to search his phone. *Id.* at 4. On his phone, Defendant pointed to WhatsApp conversations with Don Roberto (saved as "DON ROBERTO" in the contacts list). *Id.* Agent Mella observed Don Roberto's phone number and his communications with Defendant (via both text and voice messages). *Id.* Those conversations directed Defendant to deliver the drugs to "las torres" on June 8 or 9, 2018. *Id.*

Defendant confirmed he was expecting Jose Moya to arrive the night of June 6, 2018 to drop off ten bundles, and he told the agents that Don Roberto had instructed him to give the bulk currency hidden in his home to Jose Moya for transport back to Mexico. *Id.* Defendant told agents where in his house he had hidden the bulk currency. *Id.* at 3. Law enforcement searched the location described by Defendant and found $198,184.00. Mella Aff., ¶ 19. Law enforcement also found a firearm inside Defendant's home, which he said was for his protection. *Id.*, ¶ 20.

After Defendant was arrested, he was incarcerated at the Bowie County jail facility. Docket

Entry # 64, Exhibit 3 at 1. During his incarceration, Defendant spoke with his wife on several recorded phone calls. *Id.* at 1–3. During one of those calls, Defendant and his wife discussed his admissions to the DEA the night he was arrested. *Id.* at 2. During that discussion, Defendant did not claim his statements were coerced. *See id.* Instead, he told his wife he had admitted to taking trip because he believed it would help reduce his sentence. *Id.*

### III.  MARCH 12, 2019 HEARING

#### A.    Defendant's testimony

Defendant testified at the suppression hearing as follows.  During the middle of the night on June 7, 2018, Defendant, his wife, and three children were asleep when law enforcement officers with the DEA, including Agent Max Mella, broke through the door of his house.  Report's Transcript of Hearing on Defendant's Motion to Suppress (Docket Entry # 76) ("Tr.") at 3:15-4:14. The officers went into his kids' room, pulled his children (ages 8, 14 and 22) out of bed at gunpoint, and lined them up, along with Defendant's wife, in the living room like they were criminals.  *Id*. at 5:1-16; 12:10-13.  According to Defendant, the agents "were tearing everything inside the house." *Id*. at 5:18-24.

The agents found $200,000.00 in Defendant's closet and a pistol in a safe.  *Id.* at 21:10-25. After the agents searched the house, they loaded Defendant into an SUV. According to Defendant, the agents dragged him outside and took him to Agent Mella's black SUV.  *Id.* at 6:4-24. They did not let Defendant "put anything on."  He only had on shorts, "no shoes, no anything."  *Id.* at 6:22-23. Agent Mella and Defendant sat in the front, and another agent was in the back.[1]  *Id.* at 7:2-19; 22:14-

---

[1] According to Agent Darby Hodges, the supervising agent in the back, Defendant was sitting in the front passenger's seat.  Although Agent Hodges was initially sitting behind Defendant, he changed seats during Agent Mella's interview because he got in and out of the SUV to check on the

5

18.

Agent Mella had a "yellow notebook" or "legal pad" with "everything written on it," and he started asking Defendant questions/reading Defendant "whatever he had on there." *Id.* at 7:15-18; 19.24-10:5; 11:7-15. Before Agent Mella asked Defendant questions, no one read Defendant his *Miranda* rights. *Id.* at 7:23-8:24. The agents did not ask Defendant to sign any pieces of paper before he answered any questions. *Id.* at 8:25-9:2. Defendant felt like he was in custody and was not free to leave. *Id.* at 9:3-22.

Defendant testified the information written on the pad was not information Defendant told Agent Mella but information Agent Mella had before he started meeting with Defendant. *Id.* at 11:23-12:3. According to Defendant, every time Agent Mella asked Defendant a question, the other agent in the back would state the agents might be able to get leniency for Defendant if Defendant agreed to talk with them (they would talk to the judge and might be able to get a "lesser sentence"). *Id.* at 7:19-21; 10:13-21; 11:19-22. Defendant stated the agent in the back had a "strong alcohol smell." *Id*. at 11:17-19.

Defendant felt coerced and intimidated by the agents. *Id.* at 10:22-11:6. Defendant was scared for himself and for his family; he wanted them to be safe; and it was real early in the morning. *Id.* at 12:10-16. Therefore, Defendant agreed to everything the agents were saying. *Id.* at 12:14-24 ("It was things that they told me to agree with."). Defendant states he was not agreeing voluntarily. *Id.* at 12:25-13:2.

Defendant was in the SUV about forty minutes. *Id.* at 13:3-5. While in the SUV, Defendant signed a "consent-to-search form" allowing the agents to search his cell phone. *Id.* at 15:11-20. He

agents in the house. *Id.* at 114:19-115:7.

6

said he signed the form because he had nothing to hide. *Id.* at 15:20-22. Defendant testified he had "no idea" who Don Roberto is. *Id.* at 23:14-15. Defendant did not know why Don Roberto's phone number was in his phone. *Id.* at 23:16-18. According to Defendant, Agent Mella told him there were messages in his phone from Don Roberto. *Id.* at 23:19-24:7.  Defendant stated he never communicated with Don Roberto via WhatsApp. *Id.* at 24:15-17. Defendant uses WhatsApp to communicate with family. *Id.* at 24:18-25:6.

At the conclusion of the approximately forty minutes in the SUV, the agents returned Defendant to the front of his house. *Id.* at 13:6-9.  Agent Mella went inside the house. *Id.* at 13:9-10. Defendant asked another DEA agent if he could get his sandals or a shirt and he was told "no." *Id.* at 13:10-14:1. Defendant's wife brought Defendant his sandals and shirt, and Defendant was handed over to a state trooper. *Id.* at 14:23-25. At that time, Defendant was read his *Miranda* rights before the state trooper put Defendant in his SUV. *Id.* at 14:25-25:7. Defendant testified he was not read his rights before speaking with Agent Mella. *Id.* at 14:6-23. Defendant does not feel his rights were read to him in a timely fashion. *Id.* at 16:20-17:5. He did not voluntarily waive his rights before he talked with Agent Mella. *Id.* at 17:6-23.

Defendant testified he made some phone calls to family members from the jail on June 18, 2018.  Defendant had a conversation with his wife in Spanish while in jail; he did not talk to Alan Chavez.  *See* Gov. Exh. 2, line 14.  At that time, Defendant was no longer feeling intimidated. *Id.* at 16:13-14. He did not know how to react to being in jail because he had never been in jail before. *Id.* at 16:15-18.

On cross examination, Defendant acknowledged he has a brother named Jose Moya. *Id.* at 19:24-20:1. Defendant denied ever working to traffic drugs. *Id.* at 25:7-23. Defendant acknowledged

7

he ate breakfast with his brother Jose Moya at a Waffle House in Dallas near Interstate 35, but he denied telling Agent Mella that Don Roberto would contact him to let him know when to expect drugs from Jose Moya or that he delivered drugs as directed by Don Roberto. *Id.* at 25:24-27:4. According to Defendant, he told Agent Mella he knew there was something "bad in the bundles" that he was getting from Jose Moya because "they were talking to [him], telling [him] all this stuff to say." *Id.* at 26:15-19. Defendant testified he did not say anything to the agents; he only agreed with everything Agent Mella and the agent in the back told Defendant. *Id.* at 27:16-20. The agents told Defendant everything that is recorded, including that Defendant received $2000.00 for travel expenses each trip. *Id.* at 27:12-28:1.

Defendant testified the $200,000.00 found in his closet did not belong to him, and he had "no idea" who the money belonged to. *Id.* at 21:13-20; 31:1-9. The money was in a box, which Defendant had in his possession for one day. *Id.* at 31:20-33:21. Someone showed up at Defendant's house with the box and put it on his doorstep. *Id.* at 31:25-32:2. It did not appear it had been mailed. *Id.* at 32:8-11. Defendant put the box in his closet. *Id.* at 32:15-19. Defendant was not curious about what was in the box. *Id.* at 32:22-33:3. According to Defendant, someone was going to pick it up, but he did not know who or when. *Id.* at 33:4-13.

Defendant testified he is always working, and he travels no more than about one hour from Texarkana for his work. *Id.* at 34:6-20. Defendant picks up wood for paper mills. *Id.* at 34:11-14.

When asked about whether he took drugs from McAllen, Texas to Nashville, Tennessee for Don Roberto, Defendant stated he has never been to Nashville. *Id.* at 28:6-16. Defendant denied saying he told Agent Mella that on one occasion he brought bulk cash back from Nashville to his home in New Boston. *Id.* at 28:23-29:1. Defendant denied he said he took ten bundles to Columbus,

Ohio for Don Roberto or that he had ever been to Ohio. *Id.* at 29:6-8; 35:17-36:19. Defendant denied he said Jose Moya delivered bundles to his home, stating the only time he saw his brother was when he brought Defendant tequila. *Id.* at 29:14-30:9.

Defendant denied telling Agent Mella Don Roberto directed him to bring money back to New Boston. According to Defendant, that is what Agent Mella said. *Id.* at 36:20-23. Defendant denied telling Agent Mella that Defendant took drugs to the Bronx, New York for Don Roberto. *Id.* at 36:24-37:2. When questioned about the phrase "barrer la basura" (*sweep the trash*), Defendant denied telling Agent Mella that was what Don Roberto used when he wanted Defendant to pick up money. *Id.* at 37:19-38:2. Defendant stated Agent Mella had that exact phrase written down on his pad. *Id.* at 38:2-6. According to Defendant, neither Agent Mella nor Defendant discussed $100,000.00 from a man named El Chino in Bronx, New York. Defendant does not know where that information came from. *Id.* at 38:7-39:18.

Defendant stated he has only been to New York one time in 2017 or 2018. Defendant drove a big truck from Hope, Arkansas to make a delivery for his friend's trucking business. *Id.* at 39:23-41:1. Defendant also went to Ohio in the big truck. All other trips were to Las Vegas or California. *Id.* at 41:2-13.

Although Defendant stated the signature on "Consent to Search" form (introduced at the hearing as Exhibit 1) looked like his signature, he stated he did not remember signing the document. *Id.* at 43:16-46:6 (stating he signed something for Agent Mella in the SUV, but he did not remember signing the "Consent to Search" form). He did not read that document, and one of the agents told him where to sign. *Id.* at 46:12-24. He was too nervous at the time with the agent in the back telling him that "if [he] did this, if [he] did that, [he] was going to get a lesser sentence, that they can talk

to the judge." *Id.* at 46:14-17. Defendant stated he did not sign the actual form with the signature that looked like his signature but was instead given a blank piece of paper to sign. *Id.* at 45:14-24; 48:6-11; 49:18-50:3 (stating he had "no idea" what was written on the piece of paper he signed, then stating nothing was written on the piece of paper, then stating he assumed "it had something on there," then stating he did not read anything, and finally stating he "should have read it"). Defendant testified he did not know what he was doing because he was afraid and nervous. *Id.* at 48:15-19; 49:13-15.

Defendant acknowledged he did tell Agent Mella the code to his Samsung phone. *Id.* at 47:14-48:6. Defendant was unsure if the agents looked at Defendant's phone with him. *Id.* at 50:4-11. Defendant stated they took his phone with them along with some watches his wife had given him for Christmas. *Id.* at 50:8-13. According to Defendant, he did not show Agent Mella his WhatsApp conversations with Don Roberto; rather, after Defendant gave Agent Mella his pass code, Agent Mella went straight to those conversations. *Id.* at 50:17-51:4. Defendant stated he did not know what was in those conversations with Don Roberto; he had never seen them before; he had never communicated with Don Roberto; and he did not give Agent Mella Don Roberto's phone number. *Id.* at 51:5-22. Defendant acknowledged there were "alerts from Budget car rental that were popping up while [he was] looking at the phone with Agent Mella," but he did not know what that rental car reservation was for. *Id.* at 52:6-22 (denying he had rented a car).

Defendant made inconsistent statements during his testimony. For example, Defendant did not originally contest that he provided Agent Mella the pass code to his cell phone voluntarily. *Id.* at 48:2-3; 67:24-68:3; 68:9-70:18 (stating "of course" he did so voluntarily and mentioning again that the agent in the back was saying he would take the information provided by Defendant to the

10

judge who would make a decision about the sentence). However, on re-direct Defendant stated he did not voluntarily let the agents look in his cell phone. *Id.* at 71:8-14 ("Well, they – literally they make me because I was scared.").

Based on Defendant's testimony on re-direct, Defendant's counsel orally moved to amend Defendant's motion to suppress to include the cell phone. The Court granted the motion. *Id.* at 71:16-72:10.

**B.    Agent Maximo Mella's testimony**

DEA Agent Mella also testified at the suppression hearing. *Id.* at 73:10-17. Agent Mella is fluent in Spanish, and his office is located in Tyler, Texas. *Id.* at 73:18-23. He has been in law enforcement since 2012. He has been with the DEA since January 2018. *Id.* at 74:4-12. Agent Mella testified regarding the practice he has learned and employs when it comes to "custodial interrogations and *Miranda* warnings." *Id.* at 75:8-24. Agent Mella uses a yellow card (with the rights in English on one side and Spanish on the other side) as an aid in interrogations. *Id.* at 75:11-76:12.

On June 6, 2018, Agent Mella received a call between 8:00 and 9:00 p.m. about a drug bust in Corpus Christi, Texas. *Id.* at 76:13-24. The agents from Corpus Christi advised there may be a suspect in the New Boston area – Defendant Armando Moya – with proceeds from drugs. *Id.* at 76:24-77:10. This information was based on the arrest of Jose Moya, Defendant's brother. *Id.* at 77:11-15. Agent Mella has since had conversations with Jose Moya, but based on information Agent Mella had at the time, Defendant was scheduled to receive the bundles Jose Moya had been stopped with, and Jose Moya was scheduled to receive a large sum of money from Defendant (a little over a hundred thousand dollars). *Id.* at 77:16-24.

11

The information Agent Mella had at that time was limited to an address, a name, that currency and drugs were to be exchanged, and this kind of exchange had happened an unknown number of times in the past. *Id.* at 77:2-79:20. Agent Mella had no information about this "broader drug trafficking operation other than there is a house, there is a man, he is expecting some drugs, there is money there, and we think he's done it a couple of times." *Id.* at 79:21-25. Agent Mella did not receive the name Don Roberto from the agents in Corpus Christi, and he did not know Don Roberto's phone number. *Id.* at 79:16-20.

While on his way to New Boston from Tyler (about a two hour drive), Agent Mella contacted local law enforcement in New Boston. A warrant was signed around midnight. *Id.* at 81:1-25. Agent Mella arrived in New Boston between 10:00 and 11:00 p.m. *Id.* at 81:6-9. The search warrant was executed around 1:00 a.m. *Id.* at 82:1-5.

Agent Mella was part of the group that entered Defendant's home (DEA team was the entry team into the house, and DPS agents provided security on the outside of the house). *Id.* at 82:7-13. When the DEA team entered the house, Agent Mella observed Defendant walking out of a room in shorts. *Id.* at 82:7-17. Agent Mella, the lead case agent on this incident, and another agent were the first agents to enter the room with Defendant's sons. *Id.* at 82:18-25, 83:16-17. The agents had their weapons drawn while entering rooms, but they were immediately put away when they noticed children were in the room. *Id.* at 83:1-13. After the house was secured, Agent Mella found Defendant in handcuffs standing "just outside the door with the agents." *Id.* at 83:14-21. Agent Mella later allowed Defendant to get a t-shirt because Defendant did not initially have on a shirt. *Id.* at 83:22-84:3.

Defendant was placed in the front passenger's seat of a black SUV. Agent Mella was in the

front driver's seat.  Initially, there were two other agents in the back (acting supervisor McCasland and special agent Darby Hodges).  *Id.* at 84:4-22.  Agent Mella started his conversation with Defendant by asking personal questions (name, address, siblings, etc.).  *Id.* at 85:1-7.  Agent Mella then pulled out his yellow card and read Defendant his rights.  Agent Mella stated he gave Defendant the option of English or Spanish, and Defendant said he did not mind/English was fine.[2] *Id.* at 85:8-24.  Agent Mella read the *Miranda* rights in English around 1:11 a.m., and Defendant responded "yes" that he understood those rights and that he wanted to speak to the agents (the "last two things in the card").  *Id.* at 85:20-86:11. Agent Mella wrote in his notes that he gave Defendant the *Miranda* warnings.  *Id.* at 104:7-15.  Agent Mella stated he has a legal pad that he carries with him to take notes, but he did not remember if it was yellow.  *Id.* at 104:25-105:7.

According to Agent Mella, Defendant initially denied he was expecting his brother but then "slowly he started coming up with the truth and told [them] that he was expecting his brother, Jose Moya, on that night to deliver some bundles and that he was supposed to give him some money that he had in the house."  *Id.* at 86:12-22.   Defendant talked about some of his past times handling drugs, including seven trips, all in which he received these bundles (ten each time) from his brother and then received direction from a guy named Don Roberto in Mexico "who would then let him know where he needed to take those bundles."  *Id.* at 86:23-87:9.   According to Agent Mella, nine bundles were seized from Jose Moya, eight of which were heroin and one of which was fentanyl.  *Id.* at 87:10-18. Agent Mella testified Defendant told him he knew there was "something bad" in the

---

[2] Agent Mella stated he started the interview in English, and at some point he made sure he told Defendant "that if he felt more comfortable speaking Spanish at any moment or with certain words, to go ahead and do so because [Agent Mella] wanted to make sure . . . [Defendant] was clear about what he was telling [Agent Mella]. . . . So, [they] morphed into somewhat of a mixture of Spanish and English; and then it was mostly Spanish towards the end."  Tr. at 97:5-18.

bundles.  *Id.* at 87:25-88:2.

Agent Mella stated he did not have any of this information prior to talking to Defendant, and he did not have any of it written down on a piece of paper.  *Id.* at 88:3-10. Agent Mella testified Defendant told him he would receive $700 or $1000 for each bundle successfully delivered, depending on the location of the delivery.  *Id.* at 88:11-16.  Defendant also told Agent Mella that "Don Roberto in Mexico would allow him to get $2,000 either from the money that he picked up or Jose Moya would bring him . . . that [was] designed only for travel expenses."  *Id.* at 88:24-89:4. Defendant admitted taking drugs to Nashville, Tennessee; Columbus, Ohio; and Bronx, New York. *Id.* at 89:5-11.  Agent Mella later corroborated that information through search warrants for cell site data on Defendant's phone.  *Id.* at 89:9-19. Based on Agent Mella's review of the records, Defendant did, in fact, travel to those locations beginning in and around October 2017 and stopping just days before he was arrested.  *Id.* at 90:8-91:6. Defendant told Agent Mella he keeps his cell phone with him when he travels.  *Id.* at 91:4-9.

In order to get that information, Agent Mella had to have Defendant's cell phone number. He did not have Defendant's cell phone number prior to his conversation with Defendant that night. *Id.* at 89:20-25.  According to Agent Mella, Defendant told him his cell phone number.  *Id.* at 90:1-3. Defendant provided Agent Mella the pass code to his cell phone.  Agent Mella did not have the pass code ahead of time.  Nor did he guess it.  *Id.* at 91:10-17.

Agent Mella testified Defendant signed the "Consent to Search" form in the vehicle at 2:00 a.m. on the night in question, "as [they] were talking in the middle of the conversation that night." *Id.* at 91:18-92:21.  Agent Mella testified they read the form together before Defendant signed it; Agent Mella explained the form to Defendant and first asked verbally if he had any issues in

14

providing consent to searching his phone.  Defendant said, "Yes. Go ahead." *Id.* at 94:5-12.  Agent Mella then wrote the description of Defendant's phone on the form and asked for his phone number. According to Agent Mella, then they "read the entire form together." *Id.* at 94:13-16.  "Once [Defendant] understood it and he signed it, then [Agent Mella] asked for his code." *Id.* at 94:16-18. Defendant's pass code is handwritten on the form. *Id.* at 93:18-20; *see also* Gov. Exh. 1.

At the hearing, Agent Mella read paragraphs two and three of the form: "I have not been threatened, nor forced in any way" and "I freely consent to this search."  Tr. at 92:22-25.  Agent Mella testified that was true; he believed Defendant was "freely consenting to the search of his phone." *Id.* at 93:1-13 (further stating he did not have any reason to believe Defendant had been threatened or forced to sign the form or to believe he was not freely consenting to the search).

Special Agent Darby Hodges also signed the form as a witness. *Id.* at 93:14-17.  According to Agent Mella, Defendant asked him during the conversation if he smelled alcohol. *Id.* at 95:23-25. Agent Mella also smelled alcohol coming from the back of the vehicle where Agent Hodges was sitting. *Id.* at 96:1-8.  Agent Mella stated Agent Hodges arrived in New Boston from Tyler around 1:00 a.m. and was with agents the entire time he was there. *Id.* at 96:10-14; 96:22-97:2.  According to Agent Mella, no one saw Agent Hodges drinking alcohol there at the scene of the search warrant. *Id.* at 96:19-21.  Agent Hodges did not play a primary role in the interview.

Agent Mella testified he spoke with Defendant for about an hour and a half that night, and Agent Mella terminated the interview around 2:30 a.m. because he thought he had everything that Defendant was going to tell them that night. *Id.* at 93:21-94:4; 95:3-12. According to Agent Mella, at no time did he intimidate or coerce Defendant, use physical force on him, brandish his firearm, raise his voice, threaten any violence to him, or use any deception on him. *Id.* at 97:20-98:25.  Agent

Mella stated he communicated to Defendant what was happening and did not deceive him in any way when he read Defendant his *Miranda* rights. *Id.* at 99:1-8.

Agent Mella did not make any specific promises about future leniency that Defendant would receive if he spoke with him, but he did tell Defendant that the "best day to cooperate is Day 1 and based on this cooperation, [Agent Mella would] go take that information to [the] prosecutor [who would] take it to the judge who ultimately makes – takes it for consideration and decides – makes a decision in the end." *Id.* at 99:9-21. Agent Mella did not make any specific promises; he just told Defendant the judge would consider his cooperation in deciding his sentence. *Id.* at 100:4-25.

Based on what he perceived of Defendant on the night in question, it was Agent Mella's understanding that Defendant fully understood the rights Agent Mella read to him and was freely and voluntarily talking to Agent Mella while in custody. *Id.* at 101:15-20. According to Agent Mella, although Defendant was scared of the charges against him that night, he did not appear to be confused at all that night. *Id.* at 98:7-17; 101:21-102:1. During the conversation, Defendant provided a lot of details about conversations and trips he had made, including specific months, amounts of money, specific cities, and descriptions of some of the co-conspirators he had met in those cities. *Id.* at 102:5-103:10. Defendant went through his phone after he signed the consent form and showed Agent Mella messages from Don Roberto. The conversations corroborated the details Defendant had provided earlier in the conversation. *Id.* at 102:17-103:5.

## C.  Agent Darby Hodges' testimony

DEA Agent Hodges also testified at the suppression hearing. *Id.* at 107:4-8. Agent Hodges has been with the DEA for twenty years. *Id.* at 107:9-13. Agent Hodges was the acting special agent in charge on the evening in question. As supervisor, he did not take an active role. *Id.* at 108:1-21

(stating it was more of a supportive role). According to Agent Hodges, the agents knew limited information but not any of the specific information regarding the drug trafficking scheme. *Id.* at 108:22-109:16. Agent Mella did not have that information ahead of time. *Id.* at 109:17-110:7.

Agent Hodges was sitting in the back seat of the SUV during Agent Mella's interview with Defendant. *Id.* at 110:8-111:6. Shortly after Defendant entered the SUV (around 1:10 a.m.), Agent Hodges observed Agent Mella pull out and read Defendant his *Miranda* rights from the yellow card. *Id.* at 110:10-18; 111:10-19. Defendant gave an affirmative indication that he understood his rights, and Agent Hodges felt comfortable with the conversation continuing. *Id.* at 110:19-111:2. Agent Hodges believed Defendant was freely conversing with Agent Mella, and Agent Hodges had no concerns whatsoever about Defendant's rights being violated that night. *Id.* at 112:12-18.

When asked about Defendant's reference to alcohol during that conversation, Agent Hodges testified he had been in Tyler earlier that evening and at some point had consumed one alcoholic beverage. *Id.* at 112:19-113:10. The agents left Tyler around 9:30 that evening to drive to New Boston. *Id.* at 112:25-113:5. Agent Hodges did not have any alcoholic beverage after that. *Id.* at 113:11-13. On the drive to New Boston, Agent Hodges stopped to get a coffee, water, etc. Five or six hours had passed since Agent Hodges had last consumed alcohol before Defendant's interview. *Id.* at 113:14-114:1. Agent Hodges testified he did not feel impaired in any way. *Id.* at 114:3-7.

Agent Hodges did not make statements to Defendant about going to the judge on his behalf to get him a lesser sentence. *Id.* at 115:8-11. According to Agent Hodges, any statements that were made to Defendant "would be through Agent Mella in the Spanish language, more than likely." *Id.* at 115:13-15. Agent Hodges did not think he said more than two or three sentences to Defendant, and those sentences did not involve encouraging Defendant to cooperate in return for a lesser

17

sentence.  *Id.* at 115:15-20.

## IV.  APPLICABLE LAW

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that before a person in custody is interrogated, that "person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. A person may waive the rights conveyed in a *Miranda* warning if that waiver is made voluntarily, knowingly, and intelligently.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The waiver inquiry has two parts: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In order for a court to conclude that the prescriptions of *Miranda* have been followed, "the 'totality of the circumstances surrounding the interrogation' [must] reveal both an uncoerced choice and the requisite level of comprehension." *Id.*

## V.  DISCUSSION

Defendant seeks to suppress statements made to law enforcement on the grounds the statements were not given freely or voluntarily due to improper inducement by the agents. Defendant also seeks to suppress the evidence from his cell phone.  Defendant asks the Court to consider the totality of the circumstances, including Defendant's position that *Miranda* was not administered until after Defendant's statement was made; that the agents coerced, intimidated and/or deceived Defendant by providing the information put forth in the complaint rather than Defendant supplying that information himself; that the provision of the pass code to Defendant's cell phone was

also involuntarily made; and that there were promises of leniency.  Tr. at 116:15-117:17.

The Government argues that once arrested, Defendant was advised of his constitutional rights, voluntarily waived his rights, and agreed to speak to and assist law enforcement freely and voluntarily without any promises or assurances of leniency or release by the DEA agents.  According to the Government, the totality of the circumstances demonstrates by a preponderance of the evidence that *Miranda* was followed and that Defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *Id.* at 117:19-118:21. The Court agrees.

First, the preponderance of the evidence shows Agent Mella read Defendant his *Miranda* rights in the language of Defendant's choosing.  According to his affidavit, at approximately 1:11 a.m., Agent Mella read Defendant his *Miranda* rights. Mella Aff., ¶ 16.  The Report of Investigation provides as follows: "at approximately 1:11 a.m., [Agent] Mella, as witnessed by [Agent] Hodges and Task Force Officer . . . McCasland, read Armando Moya his constitutional rights, per Miranda." Docket Entry # 64, Exhibit 2 at 1. At that time, Defendant confirmed he understood his rights and agreed to speak with investigators. *Id.*  Agents Mella and Hodges both specifically testified at the hearing that the *Miranda* warnings were given at 1:11 a.m. as reported in the Complaint and in the Report of Investigation.

"The testimony given by the Government witnesses outweighs the completely contradictory testimony given by Defendant." *United States v. Richard*, No. CRIM. A. 4:09CR37, 2009 WL 3353309, at *4 (E.D. Tex. Oct. 19, 2009). As the burden is a preponderance of the evidence, the question is whether or not it is probably true that Defendant was extended his *Miranda* warnings and knowledgeably and voluntarily waived them. *Id.* In viewing the testimony, the Court finds the Government witnesses are telling the truth and Defendant is not. *Id.*

19

Next, the Court considers whether the Government has met its burden of showing by a preponderance of the evidence that the statements were voluntarily made. A statement is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice. *United States v. Scurlock,* 52 F.3d 531, 536 (5th Cir.1995). Any indication by law enforcement that Defendant could somehow help his case by cooperating is simply not sufficient to show that Defendant did not act under his own free and informed will. *Richard*, 2009 WL 3353309, at *3 (citing *United States v. Broussard,* 80 F.3d 1025, 1034 (5th Cir.1996) (concluding that an agreement that the United States Attorney would be apprised of a defendant's cooperation, coupled with an express admonition that a defendant would still go to prison, does not constitute a promise of leniency); *see also United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978) (concluding that a statement that the accused's cooperation will be made known to the court is an insufficient inducement to render subsequent confession involuntary); *United States v. Ornelas-Rodriguez,* 12 F.3d 1339, 1348 (5th Cir.1994) (advising accused that there are advantages to cooperating does not render a confession involuntary)).

After considering the pleadings and the testimony presented at the hearing, the Court finds Defendant made a voluntary waiver of his *Miranda* rights and was not coerced or threatened by law enforcement officers to do so. The Court "did not hear circumstances that convinced it that the Defendant's free will was jeopardized in any way or that any promises were made to the Defendant or broken by the Government." *Richard*, 2009 WL 3353309, at *4. That Defendant's statements were the product of his free and rational choice is exemplified by the degree to which Defendant provided the agents with detailed information—information the agents testified they did not previously have—about his criminal activities. Additionally, Defendant provided written consent

20

for law enforcement to search his phone, signing the official DEA "Consent to Search" form.

Although Defendant now asserts his consent to the search of his cell phone was not voluntary, the evidence does not support such an assertion. Such detailed information over an extended conversation is inconsistent with intimidation, coercion, or deceit on the part of law enforcement. Additionally, the evidence shows Defendant's waiver was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

The preponderance of the evidence also shows that Defendant's waiver of his rights was knowing and intelligent. According to Agent Mella, after reading Defendant his *Miranda* rights as witnessed by two other agents, Defendant "stated that he understood his constitutional rights and agreed to speak to investigators." Mella Aff., ¶ 16. By Defendant's own admission at the hearing, he had a basic understanding of *Miranda* warnings. *Id.* He testified at the hearing that he knows what *Miranda* rights are and had heard before about having the right to remain silent. Tr. at 8:8-20.

Finally, Defendant has failed to point to any evidence to support his assertion that his waiver was not voluntary, knowing, and intelligent. *See* Docket Entry # 49 at 1–2. The Supreme Court has held that coercive police conduct can render a statement by a defendant involuntary and therefore an inadmissible violation of the Fifth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). The analysis centers on identifying instances where the totality of the circumstances are "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 112 (1985). And "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 164. Moreover, when—as here—law enforcement complies with the dictates of *Miranda*, a defendant will "rare[ly]" be able to make a colorable argument that his statement was

compelled. *Dickerson v. United States*, 530 U.S. 428, 444 (2000).

Here, there is no evidence to suggest there was any kind of coercive police conduct that was causally related to Defendant's confession let alone conduct that was offensive to a civilized system of justice. Defendant's detailed recitation of his criminal activity and his written consent to search his phone are contrary with a finding of coercive police conduct. Given the totality of the circumstances and law enforcement's compliance with the dictates of *Miranda* in this case, this is not one of the "rare" cases where a defendant might be able to make a colorable argument that his statements were compelled.

The Government has satisfied its burden of showing that Defendant knowingly and voluntarily waived his rights prior to making the statements he seeks to suppress. Therefore, there is no basis for suppression. *See Richard*, 2009 WL 3353309, at *4.

## VI. RECOMMENDATION

Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Defendant's Motion to Suppress Statement (Docket Entry # 49) be **DENIED**.

### Objections

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.

 A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal

conclusions accepted and adopted by the district court.  *Douglass v. United States Auto Ass'n.*, 79

F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 16th day of April, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE